J-S66031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: T.M.M.C., a Minor, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.C.C., Father | No. 1094 MDA 2014 |

Appeal from the Decree entered June 3, 2014,
in the Court of Common Pleas of Schuylkill County,
Orphans' Court, at No(s): A63-062B-14

BEFORE:  BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED NOVEMBER 26, 2014**

K.C.C. ("Father") appeals from the Decree granting the Petition filed by the Schuylkill County Children and Youth Services ("CYS" or the "Agency"), and involuntarily terminating Father's parental rights to his daughter, T.M.M.C. ("Child"), born in June 2010, pursuant to section 2511(a)(2) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2) and (b). We affirm.

Child was adjudicated dependent on July 26, 2010, and has remained in Agency foster care until the present time.  N.T., 5/13/14, at 28.  She has been placed with the same foster parents since November 2010.  ***Id.***  Child's two older half-brothers also are placed in the same foster home, as well as another female foster child.  ***Id.*** at 35, 37.  The foster parents wish to adopt all four of their foster children.  ***Id.*** at 37.

On February 19, 2014, the Agency filed a Petition to terminate the parental rights of Father, who is incarcerated, pursuant to section

2511(a)(1), (2), (5), (8), and (b), of the Adoption Act.[1]  On May 13, 2014, the trial court held a hearing on the Petition.  At the hearing, the Agency presented the testimony of Steven Fernsler ("Mr. Fernsler"), a placement caseworker for CYS assigned to Child's family.  N.T., 5/13/14, at 6.  CYS also presented the testimony of Joseph Sheris, M.A. ("Mr. Sheris"), a psychologist in private practice with Psychological Associates of Schuylkill County.  Mr. Sheris testified as a stipulated expert in the field of psychology, handling the completion of sex offender evaluations and making recommendations for treatment.  *Id.* at 50.  Mr. Sheris testified with regard to his professional involvement with Father.  *Id.* at 51.  Father also testified on his own behalf.

On June 3, 2014, the trial court entered the Decree terminating Father's parental rights under section 2511(a)(2) and (b).  On July 2, 2014, Father filed a Notice of Appeal, along with a Concise Statement of Errors Complained of on Appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now presents the following claims for our review:

> 1. Whether the trial court abused its discretion in determining that [the Agency] produced clear and convincing evidence that the conditions and causes of [Father's] incapacity, abuse,

---

[1] On February 19, 2014, the Agency filed a Petition to confirm the consent of Child's mother, J.L.S. ("Mother"), to the termination of her parental rights as to Child.  The trial court addressed the Petition at the termination hearing on May 13, 2014.  Although the Agency's Petition regarding the termination of Mother's parental rights is included in the certified record, the trial court's Decree, with regard to that Petition, is not in the certified record.  Mother is not a party to the instant appeal, nor has she filed her own appeal.

neglect, or refusal which has caused [Child] to be without essential parental care, control, or subsistence necessary for her physical or mental well-being cannot or will not be remedied by [Father], as required by 23 Pa.C.S.[A.] § 2511(a)(2)?

2. Whether the trial court abused its discretion in addressing the second part of the bifurcated process and determining that the parental rights of [Father] should be terminated pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Father's Brief at 4.[2]

In his first issue, Father asserts that, prior to his incarceration, he was cooperating with the Agency, and has expressed his desire to continue to do so upon his release from prison. *Id.* at 9-10. Father alleges that he has attempted to maintain a relationship with Child during his incarceration. *Id.* at 10. He claims that his failure to complete the goals of his Family Service Plan ("FSP") was, in large part, the result of his incarceration since June 19, 2011, and his frequent moves between various federal correctional facilities. *Id.* at 11. Father states that his projected date for release from prison is May 7, 2015, and that he might be released to a halfway house at an earlier time. *Id.* at 13.

We review an appeal from the termination of parental rights, in accordance with the following standard:

---

[2] Father has changed the language from that used in his Concise Statement. However, Father sufficiently preserved the issues in his brief for our review. *See Krebs v. United Ref. Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved and concise statement is deemed waived).

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d 567[, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

- 4 -

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we focus on section 2511(a)(2), as did the trial court in its June 3, 2014 Opinion, which it adopted in its Rule 1925(a) Opinion.

Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not

consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), three elements must be met:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citations omitted).

Our Supreme Court has explained our inquiry under section 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."[].

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental

- 6 -

duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d at 827 (citations omitted).

Moreover, our Supreme Court has held that a parent's incarceration may be considered as a factor in the termination analysis:

[We] now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent" sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). ***See e.g. Adoption of J.J.***, 515 A.2d [883,] 891 [(Pa. 1986)] ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); ***[In re:] E.A.P.***, [944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child, pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

***In re Adoption of S.P.***, 47 A.3d at 830-31.

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity

or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

After a careful review of the record, we cannot grant Father relief on his claim. We adopt the trial court's discussion of section 2511(a)(2) as this Court's own.[3] *See* Trial Court Opinion, 6/3/14, at 3-6. The clear and convincing evidence of record confirms the trial court's determination that Father did not remedy the conditions that caused Child to come into care; and that Father has been, and continues to be, unable to provide proper care for Child, warranting the involuntary termination of his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). *See* Trial Court Opinion, 6/3/14, at 3-6; *see also In re Adoption of S.P.*, 47 A.3d at 826-27.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (providing that, once a court determines that the parent's conduct warrants termination of his or her parental rights pursuant to section 2511(a), the court then conducts the second part of the analysis, pursuant to section 2511(b), to determine "the needs and welfare of the

---

[3] We note that the trial court's discussion cites this Court's decision in *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010), and *In re Adoption of S.P.*, 864 A.2d 588 (Pa. Super. 2004), with regard to an incarcerated parent. *See* Trial Court Opinion, 6/3/14, at 5. The trial court's discussion of these cases is consistent with our Supreme Court's decision in *In re Adoption of S.P.*, 47 A.3d at 826-27. Thus, we will not disturb it, and adopt it with the additional citation to our Supreme Court's decision in *In re Adoption of S.P.*, as we have set forth in this Memorandum.

child under the standard of best interests of the child."). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

With regard to section 2511(b), Father argues that the trial court should not have proceeded to address the second part of the bifurcated analysis, because it improperly determined that section 2511(a)(2) was satisfied. Father's Brief at 14. As the competent evidence of record supports the trial court's determination that section 2511(a)(2) was satisfied, Father's second claim is without merit. Nevertheless, our careful review of the certified record, in accordance with our case law, reveals that there was competent evidence in the record to support the termination of Father's parental rights to Child under section 2511(b).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

- 9 -

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

As to the bond analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

Here, Father failed to "exhibit [the] bilateral relationship which emanates from the parent[']s willingness to learn appropriate parenting…." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). The trial court found, from the testimony of Mr. Fernsler, that Father had a complete absence from Child's life since June 2011, except for a few letters and inquiries about her well-being. Trial Court Opinion, 6/3/14, at 7. The trial court also found that Father failed to place himself in a position to develop a real bond with Child. *Id.*; *see also In re J.L.C.*, 837 A.2d at 1249. In fact, the trial court found from the testimony that there was an absence of any meaningful relationship between Child and Father, and that Child would not even recognize Father if she saw him. Trial Court Opinion, 6/3/14, at 7.

Additionally, as part of its bonding analysis, the trial court appropriately examined Child's relationship with her foster parents. *See In re: T.S.M.*, 71 A.3d at 267-68 (stating that existence of a bond attachment

of a child to a parent will not necessarily result in the denial of a termination petition, and the court must consider whether the child has a bond with the foster parents). The trial court found that Child has a bond with her foster parents, who have served as her foster parents since she was five months old. Trial Court Opinion, 6/3/14, at 7. Moreover, the trial court considered that the foster parents are pre-adoptive with regard to Child and her two older half-siblings. *Id.*

The trial court found that Child is a happy, healthy, and normal child, who has been well-cared for by her foster parents. *Id.* The trial court determined that the foster parents have provided for Child on a daily basis, and have taken care of all of her medical needs, behavioral issues, and emotional needs. *Id.* Although Child is not in school, the trial court found, Child's foster parents are able to work with any scholastic issues, should any arise. *Id.* After considering Child's relationship with Father and her foster parents, the trial court found that termination of Father's parental rights would better meet Child's needs and welfare. *Id.* The trial court also found that the termination of Father's parental rights would not have a detrimental effect on Child, as she lacked any meaningful bond with Father, and would be in her best interests. *Id.*

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, that, if severed, would

cause Child to suffer irreparable harm, we conclude that the trial court did not abuse its discretion in finding competent evidence to support the termination of Father's parental rights under section 2511(b). **See In re Adoption of S.P.**, 47 A.3d at 826-27. Accordingly, we affirm the Decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/26/2014

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

In Re:  T. M. M. C.                                :  No. A63-062B-14

▬▬▬▬▬▬▬▬▬▬▬▬
a Minor                                            :

                                                   :  Contested Involuntary Termination


Counsel of Record:  Karen E. Rismiller, Esquire – for the Petitioner
                    Thomas J. Campion, Esquire – for the Natural Father
                    James G. Conville, Esquire – for the Minor Child


**OPINION OF COURT**

BALDWIN, P.J.

Schuylkill County Children and Youth Services (hereinafter "Agency") filed a Petition to
involuntarily terminate the parental rights of K. C. C. ▇▇▇▇▇ (hereinafter FAther ▇▇▇ ),
the natural father of T. M. M. C. ▇▇▇▇▇▇▇n (hereinafter Child ▇▇ ). The Agency began
providing services to the family prior to Child's ▇▇ birth due to drug and alcohol issues, home
conditions and inadequate supervision. Child ▇▇ was born on June 3, 2010. She was adjudicated
dependent on July 26, 2010, and has remained in Agency foster care until the present. Child ▇▇
has been with the same foster parents since November 2010.

The termination of parental rights is governed by statute. The party seeking termination
must prove by clear and convincing evidence that the parent's conduct satisfies at least one of
the nine statutory grounds delineated in Section 2511(a) of the Pennsylvania Adoption Act,
23 Pa. C.S. §2101 *et seq.* See also **In re I.J.**, 972 A.2d 5, 9 (Pa.Super. 2009). If the court
determines that the parent's conduct warrants termination, it must then engage in an analysis of
the best interests of the child pursuant to Section 2511(b) and take into consideration the
developmental, physical, and emotional needs of the child.

The termination of parental rights carries with it a constitutional significance because of
the importance of the rights involved. **In re K.B.**, 763 A.2d 436 (Pa.Super. 2000). In order to
support the termination of parental rights, clear and convincing evidence must be presented to

enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the facts at issue. **In re Adoption of Atencio**, 650 A.2d 1064 (Pa. 1994).

In this case, the Agency sought the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. §2511 (a)(1), (a)(2), (a)(5), (a)(8) and Section 2511(b). A finding under any one of those sections is sufficient to support a termination of parental rights. We find that the Agency produced clear and convincing evidence that Carrington's parental rights should be terminated pursuant to Section 2511 (a)(2) which specifically provide as follows:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. **23 Pa.C.S. §2511(a)(2)**.

In addition, if the court finds that the grounds have been established for terminating parental rights, then the court must engage in additional analysis as required by Section 2511(b) which provides as follows:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child . . . . **23 Pa.C.S. §2511(b)**.

A child needs love, protection, guidance and support, and these physical and emotional needs cannot be met by a merely passive interest in the development of the child by the natural parent. **In re Shives**, 525 A.2d 801 (Pa.Super. 1987). The satisfaction of these needs requires the natural parent's affirmative performance, including a genuine effort to maintain communication and association with the child. **Id**. Thus, when a child has been removed from the care of the natural parents and placed in foster care, the natural parents have an "affirmative duty" to work toward the return of the child. **In re Adoption of J.J.**, 515 A.2d 883, 890 (Pa. 1986) (citation omitted).

The Agency is also required to make reasonable efforts to promote the reunification of a child with the natural parents. **In re I.J.**, *supra*. However, this obligation is not indefinite, and

2

the Agency must respect a child's right to a stable, safe and healthy environment, so that when reasonable efforts at reunification have failed, the Agency must work toward terminating the parental rights and placing the child with adoptive parents. **Id**. As we have repeatedly acknowledged, a "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **Id**. at 9. A parent who cannot, or will not, meet the minimum requirements of care within a reasonable time may properly be considered unfit and have his parental rights terminated. **In re Z.P.**, 994 A.2d 1108 (Pa.Super. 2010).

In order to satisfy the requirements of section 2511(a)(2), the Agency must produce clear and convincing evidence of the following: (1) the parent's repeated and continuing incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal has caused the child to be without the essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. **In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

We know from the record that the Agency began working with [Father ██████] sometime in early 2010 prior to [Child's] [██████]'s birth and subsequent placement with the Agency. According to the Family Service Plan (FSP), [Father ██████] was to address issues of drug and alcohol abuse, mental health problems and participate in Agency services, including keeping the Agency informed about his whereabouts. The Agency was most concerned that he undergo sexual offenders treatment to address his issues of repeated sexual contact with minors. [Father ██████]led no contest to indecent assault without consent in 2002, indecent assault on a person less than 16 years old in 2003, and statutory sexual assault, indecent assault, and recklessly endangering another person in 2005.

[Father ██████] has been incarcerated continuously since July 2011, has spent time in several facilities, and has been in federal prison in Arizona since January 2014 for various drug charges. Prior to his incarceration, [Father ██████] was working toward some of his FSP goals. He

3

had completed two random drug screens by the Agency; one was positive and one was negative. He had been diagnosed with a schizoaffective disorder, bipolar type, after a voluntarily commitment in July 2010. He was attending an out-patient mental health program but had not fully completed that treatment due to his incarceration. [Father] did make himself available to the Agency; and although the Agency did not always know his whereabouts, he did keep in touch with them and provided his address on an irregular basis. He was polite and courteous and attended most of his scheduled supervised visits with [Child] but his visits never progressed to unsupervised or to visits outside the office. [Father] did not get treatment for his sexual offender's tendency. He claimed that he did not complete professional treatment for his sexual issues because the group setting made him very uncomfortable, as he was with a group of "other child molesters" and would have preferred one-on-one sessions. [N.T., p. 69]. [Father] also said that he did not complete his treatment because he lost his job and was unable to keep paying for the sessions. The Agency was very concerned with [Father]'s "minimization" of his sexual deviancy and past offenses and discussed its concerns with him on a regular basis, including as recently as January of 2014. [N.T., p. 39].

With regard to [Father]'s progress on his FSP goals since his incarceration in July 2011, [Father] underwent a mental health evaluation in January 2014 and completed a self-help anger management workbook entitled "Cage Your Rage." [N.T., p. 71]. [Father] provided no proof of completion of such a program and said he was "awaiting" his certificate from that program. [N.T., p. 71]. He also explained that he did not participate in programs while incarcerated because the facilities lost all of his paperwork, and he was limited due to being housed in the Special Housing Unit. [Father] also reported that his counselors never got back to him about the availability of programs. He is currently taking driver's education classes, but stated that he is on a "waiting list" for the major programs he needs. [N.T., p. 71]. He could not provide any information on how long it might take for him to be able to take any of these programs and admitted that he was not even sure if they were going to have any of those programs for the rest of the year. [Father] stated that his maximum release date is May 7,

4

2015, and that he is awaiting a halfway house date, but was not sure when that date might be. He also expects to be on parole for an additional three years. He anticipates getting a job after his release, but he is also trying to work on "getting [his] SSI back on track." [N.T., p. 74].

While incarcerated, *Father* ████ has sent two or three letters to the Agency and to *child,* ████ herself. His letters to the Agency would ask about her and how she was doing, but the letters often contained attempts to minimize his sexual offenses. [N.T., p. 32]. The last time *Father* ████ saw *Child* ████ was June 2011. The Agency has sent him pictures of ████ at his request. He has not called the foster parents because he was afraid that they would think that he was trying to "harass" them or cause a problem. [N.T., p. 76]. He has not sent gifts or paid support.

The failure or refusal to perform parental duties should be measured "in light of what would be expected of an individual in similar circumstances" to the parent under examination. **Lookabill v. Moreland**, 485 A.2d 1204, 1206 (Pa.Super. 1984). The totality of the circumstances surrounding the parent's failure to perform parental duties must be considered, including the effect of certain barriers on the contact between the parent and the child. **In re Z.P.**, *supra*.

The fact that a parent is incarcerated alone is not a sufficient basis for terminating the parent's rights for a failure to perform parental duties. **In re Adoption of S.P.**, 864 A.2d 588 (Pa.Super. 2004). However, a parent's responsibilities are not tolled during incarceration. **In re Z.P.**, *supra at 1120*, (quoting **In re C.L.G.**, 956 A.2d 999, 1006 (Pa.Super. 2008). The performance of parental duties by an incarcerated parent is made more difficult while in prison, but where the parent "does not exercise reasonable firmness in declining to yield to the obstacles," his rights may be forfeited. **In re McCray's Adoption**, 331 A.2d 652, 655 (Pa. 1975).

We acknowledge that *Father* ████ was working on some goals prior to his incarceration, and that his incarceration and frequent moves to other facilities have placed obstacles in front of

5

him. He has made a minimal effort to keep in contact and be informed about ▮▮▮ **Child's** well-being. However, we cannot overlook the fact that the reason he was not able to complete the goals, including the most serious issue regarding his repeated sexual offending, is the choices he has made. Although **Father** ▮▮▮ has participated in a few programs, he has not addressed the Agency's most important concern about his minimization of his sexual offenses. **Father** ▮▮▮ describes his sexual contact with minors as actions "taken out of context" and "blown out of proportion." [N.T., p. 26]. He also describes his actions as those of being "at the wrong place at the wrong time" and a "bad decision." [N.T., p. 26]. Notably, however, is that **Father** ▮▮▮ was not adequately addressing the sexual issues even prior to his incarceration.

**Child** ▮▮▮ has already waited three years for **Father** ▮▮▮ to get himself together and cannot wait indefinitely. Her needs – emotional, financial, and otherwise – have been taken care of by her foster parents for almost her entire life. **Father's** ▮▮▮ actions exhibit a continued desire to satisfy his own needs ahead of his child's. **Father** ▮▮▮ has not acted in a manner to remedy the problems that have caused him to be unable to care for **Child** ▮▮▮ We have no reason to believe that he will be able to address those issues within a reasonable period. His release date is almost a year away. **Father** ▮▮▮ may not have willfully abandoned his daughter, but he has willfully engaged in conduct that caused him to be separated from her for a very long time and to have others care for her everyday needs and basic necessities.

In deciding the sensitive question of the involuntary termination of parental rights, we are mindful of the irreversible nature and the serious emotional impact which necessarily follow such an action. **In re Adoption of Ostrowski**, 471 A.2d 541 (Pa.Super. 1984). It is well-established that the court must engage in a bifurcated process in terminating parental rights. **In re D.W.**, 856 A.2d 1231 (Pa.Super. 2004). Initially, the court must focus on the conduct of the parent, and only after determining that the parent's conduct warrants the termination of parental rights does the court engage in the second part of the analysis, that is, determining the needs and welfare of the child under the standard of the best interests of the child. **In re C.L.G.**, 956

6

A.2d 999 (Pa.Super. 2008). A major aspect of the needs and welfare analysis concerns the "nature and status of the emotional bond between parent and child." **In re Adoption of R.J.S.,** *supra.* at 509 (citing **In re C.M.S.,** 884 A.2d 1284, 1287 (Pa.Super. 2005)). We must be careful not to destroy something necessary and beneficial to the child. **In re Z.P.,** *supra.*

We know that ▮▮▮ [Child] is a happy, healthy, and normal child who has been well taken care of by her foster parents. Her foster parents have provided for her on a daily basis and she has been in the same foster home since November 2010, where she resides with her two brothers. The foster parents have taken care of all her medical needs, behavioral issues, and emotional needs. She is not of school age yet, but her foster parents are able to work with any scholastic issues should there be any. The foster parents have expressed an interest in adopting ▮▮▮ [Child].

There is an absence of evidence to indicate that there is any meaningful relationship between ▮▮▮ [Father] and ▮▮▮ [Child]. ▮▮▮ [Child] has not seen him since June 2011 and would not recognize him. ▮▮▮ [Father] has sent a few letters, but has not otherwise attempted to maintain any bond that might have existed prior to his incarceration. He has inquired a few times about her well-being, but not acted further.

We conclude that there is no evidence showing that the minor child's needs and welfare are better served by continuing ▮▮▮ [Father's] parental rights. Instead, the termination of the parental rights of ▮▮▮ [Father] ▮▮▮, is in the best interest, needs, and welfare of ▮▮▮ [Child] ▮▮▮

▮▮▮

7